In the Matter of the Probate of the Last Will and Testament of MARY A. EDSON, Deceased; MARMONT B. EDSON, Contestant, Appellant; JOHN E. PARSONS and Others, Proponents, Respondents.

*Legacy to the attorney who drew the will — undue influence.*

The mere fact that the attorney who drew a will is named as one of the executors, to whom individually the testator's residuary estate is thereby bequeathed, is insufficient to create a presumption against the validity of the legacy, on the ground of undue influence; it is at most a suspicious circumstance, the effect of which may be dissipated and deprived of weight by the facts surrounding the case.

APPEAL by the contestant, Marmont B. Edson, from a decree of the surrogate of the county of New York, made and entered on the 14th day of January, 1891, admitting to probate the instruments propounded as the last will and testament of Mary A. Edson, deceased, and codicils thereto.

*W. F. Peddrick, Treadwell Cleveland* and *Joseph H. Choate,* for the appellant.

*David B. Ogden,* for the respondents.

BARRETT, J.:

The appellant makes no claim with regard to the formalities attending the execution of the will in question. Nor is it contended that at the time of its execution the testatrix was of unsound mind. The sole question presented by this appeal is whether there was undue influence. The appellant concedes that there was no actual fraud, but he insists that the facts surrounding the preparation and execution of the will raise a presumption of undue influence. The fact mainly relied upon is that Mr. Parsons, the attorney who drew the will, is himself a legatee thereunder. It is not contended that this fact of itself raises a presumption of undue influence; nor could it be successfully contended. (*Post* v. *Mason,* 91 N. Y. 539.) The claim is that, coupling all the other facts with this central fact, the presumption is made out. This requires an examination of all the facts.

A previous will was made in the year 1884. It also was drawn by Mr. Parsons. By this previous will Miss Edson gave to her sister Susan three equal fourth parts of her estate, together with the remainder of the other one-fourth part after the payment therefrom of certain legacies. It also provided that if she should survive her sister, the residue of her estate, after the payment of a number of legacies, should go to her brother, Marmont B. Edson. Simultaneously with the execution of this will Miss Susan Edson made a similar will, giving the testatrix three-fourths of her estate, and also the remaining one-fourth after the payment of certain legacies. Miss Susan Edson died in June, 1885 ; her will was duly admitted to probate, and letters testamentary thereon were issued to Mr. Parsons and the testatrix. Mr. Parsons thereafter occasionally advised the testatrix about her business affairs and attended to her investments. No change was made in Miss Mary Edson's will until the 2d of May, 1890, when the will now contested was executed. Mr. Parsons drew this will. He was called in and had his first consultation with regard to it on the 12th day of April, 1890. Miss Edson was then ill, and remained ill until the twenty-ninth of the following month, when she died. By this last will Mr. Parsons, Mr. John A. Bartow and Mr. Charles S. Fairchild were appointed executors, and numerous legacies were given. Miss Edson then gave one-third of the residue of her estate to these executors in trust for the use and benefit of her brother Marmont for life, with power to him to appoint by will who should take the principal of such one-third upon his death. The remainder of her estate she gave as follows :

" All the rest, residue and remainder of my estate I give and bequeath to my executors, to be divided by them among such incorporated religious, benevolent and charitable societies of the city of New York, and in such amounts as shall be appointed by them with the approval of my friend, the Rev. Dr. William R. Huntington, if living.

" If for any reason any legacy or legacies left by this my will, either pecuniary or residuary, shall lapse or fail, I give and bequeath the amount thereof absolutely to the persons named as my executors. In the use of the same I am satisfied that they will follow what they believe to be my wishes. I impose upon them, however,

no condition, leaving the same to them personally and absolutely, and without any limitation or restriction."

It is this last provision which is attacked by Mr. Marmont B. Edson, and which has led to the present contest.

After the execution of this will Miss Edson executed three codicils, varying the legacies, but otherwise reaffirming the provisions of the will; and in the second codicil, executed two days before her death, she repeats and reaffirms the above-quoted provision. And this second codicil is likewise attacked.

We have carefully considered all the evidence which was adduced before the learned surrogate, and we fail to find any circumstance bearing upon the central fact of the legacy to the three executors as individuals which raises a presumption of undue influence. On the contrary, the evidence is all the other way and tends to dissipate even a suspicion of undue influence. It is true that Mr. Parsons was Miss Edson's legal adviser and personal friend, but it is not true that she implicitly followed his advice. Miss Edson was possessed of a strong will. She was quite firm in following the bent of her own mind and judgment; and she was not readily influenced. She sometimes rejected loans that Mr. Parsons had approved of and recommended to her. At one time he advised her to sign an agreement for the consolidation of the Edison Electric Light Company, in which she was interested as a stockholder, with three manufacturing companies. She did so, but subsequently insisted, against his judgment, upon the withdrawal of her name. She insisted upon remaining in the city and taking charge of her own affairs at times when he thought she would be better away, leaving her troubles to him. Upon another occasion he expressed a very decided opinion to both of the Misses Edson against their holding Electric Company's stock, but was "given to understand that they would do as they chose to." This unwillingness to accept advice cost them considerable money, and the testatrix subsequently admitted to Mr. Parsons that "if she had acted in accordance with the opinions" which he had expressed, she and her sister "would have been saved much loss."

Even when Miss Edson was upon her death-bed this strength of will was marked. When a change of medical treatment was suggested, "she said something to the effect that she was satisfied

with the treatment *and that is all there is about it.*" When, subsequently, the matter was pressed, she declined to change the treatment — that is, the school of medicine — though willing to change the practitioner. Her letter on the subject indicates the correctness of a remark made by Mr. Parsons to Mr. Marmont Edson — when the latter requested him to speak to Miss Edson about a change of treatment — to the effect that " his sister would not permit anybody to volunteer suggestions or advice about her affairs," and it also illustrates the force of ·Mr. Edson's reply that " he had not the courage to make such suggestion to his sister." That letter is underlined in many places and it speaks emphatically of the patient's will. " I shall be able," she says, " to be *rid of Dr. Thompson*, and have a new doctor, *but by no means to change practice.* * * * I will to-day study ' the papers ' and try to have them ready for you when you are ready for them. * * * I feel it is best *to choose as I have in my case.* No more Dr. Thompson, but a new doctor, *and, in my case, no Allopathic treatment.*"

Other illustrations might be given, but they are unnecessary. The whole matter was well summed up by Dr. Peterson when he testified that " she had a will of her own and did just as she wanted to."

This is not the case, therefore, of a confidential adviser imposing his will upon a mind naturally weak, or upon a strong mind enfeebled by age or sickness. Miss Edson's mind was clear and her will was strong until the end. And Mr. Parsons' relations with her were never of an especially close, constant or confidential character. There had, in fact, been no occasion for such relations. He had had little or no law business to transact for her. The legal work attendant upon her investments had been performed by others under his general direction. He had given advice which sometimes was followed and sometimes was not. He ˙undoubtedly had her respect and esteem ; her confidence, also, as a lawyer of integrity and good judgment. But there was nothing whatever in their relations to justify the presumption of any special influence.

Coming down to the actual facts with regard to the preparation of the will, we find none of the *indicia* of undue influence. The testatrix was not secluded, nor was she surrounded by Mr. Parsons' adherents. She was perfectly free to see and advise with whom

she pleased.    Mr. Parsons came when he was requested to come, and even then was not an especially frequent visitor.

Nor was there any haste or secrecy about the execution of the instrument.    After consultation and instructions, a typewritten draft was sent to Miss Edson, and she, in her own handwriting, altered the provision for her brother Marmont, from one-half of the residue to one-third.    The execution of the will and codicils was deliberate and attended with all proper precautions.    The testimony on this head is clear and conclusive.    When the contestant desired information with regard to the will it was readily afforded him.    He met Mr. Parsons at Miss Edson's bedside two days before she died, and then and there the will was read to him.    This meeting was at Mr. Parsons' own suggestion.    Miss Edson produced a copy of the will from a bundle of papers that she kept under her pillow, and then Mr. Parsons read it, "pausing" (we quote from the testimony) "at each paragraph, or at each provision, in the progress of the reading, there being conversation between the brother and the sister, and as to this or that provision, she asking whether he had anything to say, or was that right or something of that kind, and so the reading was completed."

This interview lasted for an hour or two, and it affords evidence, not only of the openness of the transaction, but of Miss Edson's clearness of mind and strength of purpose down to within two days of her death.

That this interview aroused no suspicion of undue influence in Mr. Edson's mind is apparent from what followed.    Later, upon the same day, he told Mr. Parsons that it would be very gratifying if his sister would give some legacy to his son, Jarvis.

" I told him," said Mr. Parsons in reply, " that I could not make to her any suggestion about this testamentary provision ; that I had limited myself to answering the questions which she put to me and that I should continue to do so ; that, *as he very well knew, she was not the sort of person whom any one would be likely to venture to make suggestions to,* and he suggested himself, I think at that interview, if not at that interview at the only other interview that I ever had with him, that they, referring to the members of his family, had found fault with him that he had not influenced his sister, and

*that he had responded to them that they knew perfectly well that his sister was not a person whom any one could influence."*

It should be observed that Mr. Edson was not examined as a witness in the Surrogate's Court, and that the testimony of Mr. Parsons stands entirely uncontradicted.

Mr. Parsons, however, promised that he would repeat to Miss Edson what he, Marmont Edson, had just said about his son Jarvis. And the result was that upon the same evening Miss Edson executed the third codicil, in which she gave a legacy of $20,000 to Jarvis Edson.

We think that, upon all the evidence, the learned surrogate was fully justified in the statement that " the contestant's case absolutely and totally fails." There is really nothing left of it save the mere fact that Mr. Parsons was one of the three executors to whom individually the residuary estate was bequeathed, and that, under well-settled rules, was insufficient to create a presumption against the validity of the legacy. (*In the Matter of Smith,* 95 N. Y. 522; *Loder* v. *Whelpley,* 111 id. 250; *Parfitt* v. *Lawless,* L. R. [2 Prob. & Div.] 462.)

It was at most a suspicious circumstance. Such a circumstance " is," as was said by Baron PARKE in *Barry* v. *Butlin* (1 Curteis' Ecc. 637), " of more or less weight according to the facts of each particular case; in some of no weight at all."

Under the surroundings of this case it was a circumstance of but little weight. If it aroused a suspicion at all, that suspicion was completely dissipated when all the facts were placed before the court.

The decree of the surrogate should be affirmed, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Decree affirmed, with costs.